**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LEARNING ENHANCEMENT | ) | Case No. 16-35537 |
| CORPORATION, ET AL. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) | Honorable Jack B. Schmetterer |
| Debtors.[1] | ) |  |
|  | ) |  |

**DECLARATION OF ROGER STARK**
**IN SUPPORT OF FIRST-DAY MOTIONS AND APPLICATIONS**

I, Roger Stark ("*Roger Stark*"), hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Executive Officer ("*CEO*") of each of Learning Enhancement Corporation ("*LEC*") and The BrainWare Company ("*BrainWare*" and together with LEC, the "*Debtors*").

2. I have been the CEO of each of the Debtors since their inception and I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

3. On the date hereof (the "*Petition Date*"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Northern District of Illinois (the "*Court*"). The Debtors desire to retain possession of their properties and manage their businesses as debtors-in-possession in accordance with sections 1107 and 1108 of the Bankruptcy Code. In order to enable the Debtors to minimize the adverse effects of the

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Learning Enhancement Corporation (8197) and (ii) The BrainWare Company (6181).

chapter 11 filing, the Debtors are requesting various types of relief in "first day" motions and applications (collectively, the "*First Day Motions*") that are being filed with the Court.

4. I am submitting this declaration (the "*Declaration*") in support of the Debtors' chapter 11 petitions and First Day Motions in the above-captioned cases. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my review of public and nonpublic documents, or my opinion, based on my experience and knowledge of the industry and the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the statements set forth herein.

5. Part I of this Declaration describes the Debtors' businesses and the circumstances surrounding the commencement of these chapter 11 cases. In Part II of this Declaration, I substantiate the truth and accuracy of the relevant facts set forth in the First Day Motions filed concurrently herewith.

## I.     BACKGROUND

**A.     The Debtors' Businesses**

6. The Debtors are generally in the business of developing and marketing learning enhancement tools for use by individuals seeking to improve brain function – anything from cognition and memory to visual and auditory processing.

7. The Debtors' learning enhancement programs (collectively, the "*Products*"), including their "signature" BrainWare SAFARI program, are electronic programs that users, whether students or professionals, can purchase online and use virtually. Purchasers range from individual users (historically accounting for a very small number of gross sales) to institutional users (schools, corporations, and other purchasers who license the software products for their

2

students or employees).  Historically, the largest customer for these products has been k-12 schools.

8.  LEC was formed in 2001, and initially developed and tested various educational software programs, including the BrainWare SAFARI program.  The development of these programs was funded, primarily, though individual investments (a total of approximately $6,200,000 in equity through nearly 90 investors) and a $450,000 loan (the "*Fifth Third Loan*") that LEC obtained from Fifth Third Bank ("*Fifth Third*") in April, 2004, secured by substantially all of LEC's business assets.

9.  Unfortunately, LEC's products did not receive the level of market acceptance that LEC expected.  By 2011, and even before, it had become clear to LEC's management that to make the products a financial success, among other things, substantially more neuroscience research was needed and the software would need to be adapted to be fully web-based and work with tablets, game consoles, and mobile devices – technologies that were expanding rapidly at that time.

10. By 2011, however, LEC did not have the revenue that it had expected to fund further development, and given its failure to gain market acceptance, it was struggling to raise additional capital.  By early 2012 it had become even more apparent that LEC was in a serious bind – it did not have the revenue or funding to continue product development, and without substantial investment in such development – including research and platform upgrades – its products were falling farther behind and its already insufficient revenues were likely to decline over time.

11. In an effort to keep the business from collapsing and ensure a return for LEC's creditors and interest holders, LEC's management decided to restructure the business.  LEC

discovered that its BrainWare SAFARI software program had not reached the necessary level of market acceptance anticipated and that it needed to yield adequate revenue. LEC thus concluded that the best opportunity for BrainWare SAFARI to reach the market was for the program to be marketed and sold in conjunction with a portfolio of products and services that incorporate neuroscience research, which BrainWare had already developed. LEC entered into a license agreement with BrainWare whereby BrainWare obtained a license to use, market, and continue to develop LEC's products in exchange for BrainWare paying LEC 10% of gross receipts over $600,000, plus a one-time payment of $250,000 upon BrainWare conducting a one-time $3,000,000 capital raise (with the $250,000 roughly equating to the amount that was needed to pay off creditor claims at that time).

12. Once again, however, things did not go as planned. Unfortunately, BrainWare was unable to complete the one-time capital raise of $3,000,000. As a result, revenues and losses for 2012-2015 have been:

| Year | Gross Revenue | EBITDA |
|---|---|---|
| 2012 | $177,683.00 | (59,190.38) |
| 2013 | $284,541.00 | 11,971.17 |
| 2014 | $323,817.00 | (3,506.07) |
| 2015 | $215,057.00 | (392,948.82) |

13. In light of the fact that annual revenues never reached $600,000, BrainWare was unable to make planned license payments to LEC. LEC defaulted on its obligations to Fifth Third Bank and creditors of LEC began to commence litigation. Multiple creditors have obtained judgments against LEC and in supplemental proceedings creditors have alleged that the "corporate veil" should be pierced as between LEC and BrainWare. Obviously, these litigation

4

claims have made financing even more difficult, if not close to impossible, and with extremely limited revenue, neither Debtor has the resources to even continue to litigate these claims.

B.     **The Debtors' Capital Structure**

14.    At the time of the filing, LEC owed approximately $542,000 on account of the Fifth Third Loan (the "*LEC Secured Debt*"), which loan is secured by first priority liens and security interests (the "*Fifth Third Liens*") in substantially all of LEC's assets.  Prior to the bankruptcy filings, the Fifth Third Loan and Fifth Third Liens were acquired by JZA Holdings, Inc. ("*Buyer*"), an entity controlled by Betsy Hill, one of the Debtors' insiders.  In addition, LEC owed an aggregate total of approximately $1.1 million to unsecured trade creditors (the "*LEC Unsecured Debt*"), most of that debt from before 2012.  Out of the $1.1 million in LEC Unsecured Debt, LEC owes approximately $435,000 to Betsy Hill, an insider that has agreed to waive any claims against LEC.  LEC owes approximately $77,000 to me, which I have agreed to waive.

15.    As of the time of the filing, BrainWare owed approximately $340,000 to unsecured trade creditors (the "*BrainWare Unsecured Debt*").  BrainWare owes approximately $240,000 to Betsy Hill and me.  We have both agreed to waive any amounts owed by BrainWare.  BrainWare has no secured debt.

C.     **The Bankruptcy Case and Plan to Maximize Value**

16.    In light of the above, I have concluded that continuing the status quo is not in the best interests of any of the Debtors' stakeholders.  All that would likely result in is the Products continuing to become more outdated, and revenues continuing to decline, ultimately destroying all value and any hope of recoveries.

17. The purpose of the instant chapter 11 filings is to preserve and maximize whatever value remains, ideally resulting in a recovery for general unsecured creditors. As discussed below, I believe the best way to maximize value is to market and sell all of the Debtors' assets as a single package. Not only will this ensure that any buyer is obtaining all tangible and intangible assets associated with the Products, I believe that marketing and selling the assets together will address the concerns of creditors who have made "veil piercing" or similar arguments in state court litigation against LEC.

18. As noted above, Buyer, an entity owned by Ms. Hill, has acquired the LEC Secured Debt, and thus is the holder of approximately $542,000 in secured claims against LEC, the owner of the Products. And as discussed below, Buyer is proposing to make a debtor-in-possession loan (the "*DIP Loan*") to the Debtors in the amount of $23,000, which will be secured by substantially all of the assets of both Debtors.

19. Buyer has offered to purchase substantially all of the Debtors' assets, including the Products and all associated rights, in exchange for a "credit bid" of both the LEC Secured Debt and the DIP Loan (the "*Stalking Horse Bid*"). My hope is that if the cases go smoothly (minimizing professional fees) and the Debtors' cases are substantively consolidated, a portion of the DIP Loan will not be used, and Buyer has agreed that any unused portion of the DIP Loan can be used to make distributions to unsecured creditors.

20. In the Sale Motion (defined below), the Debtors are seeking authority to accept the Stalking Horse Bid, but only subject to higher and better bids. In light of the "insider" nature of this bid, however, the Debtors have retained an independent third-party Chief Restructuring Officer (the "*CRO*") to oversee the Debtors' financial operations during the bankruptcy and to market the Debtors' assets to other potential buyers. Although I am not sure what the value of

6

the assets are in light of the issues described above, obviously my hope is that the CRO is able to obtain higher bids, and that he can thus increase the chances that creditors will see a substantial recovery.

## II.   FIRST DAY MOTIONS AND APPLICATIONS

21.   Concurrently with the filing of the Chapter 11 Cases, the Debtors are filing certain applications, motions, and proposed orders. The Debtors request that the relief described below be granted, as each request constitutes a critical element in achieving the successful restructuring of the Debtors for the benefit of all parties in interest.

22.   I have reviewed and discussed with Debtors' counsel each of the First Day Motions filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference any factual statements set forth in the First Day Motions. It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve the goals of this Chapter 11 Case.

### A.   Debtors' Motion for Joint Administration and Substantive Consolidation

23.   By the joint administration Motion, the Debtors request that the Bankruptcy Court authorize and direct the joint administration of the chapter 11 cases of each of the Debtors and the consolidation thereof only for procedural purposes pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"). In addition, the Debtors request that the Clerk of the Bankruptcy Court make an entry on the docket of LEC's case stating that an order has been entered directing joint administration of these chapter 11 cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made in the LEC docket.

24.     The Debtors are related entities and are filing petitions in the same Bankruptcy Court. I believe that joint administration will be less costly and burdensome than separate procedural administration of the estates due to the combined docket and combined notice to creditors and parties in interest.  Parties in interest will likely file many applications, motions, orders, hearings, and notices in these cases that will affect all Debtors and their estates.  Joint administration will keep all parties informed of matters related to these cases without the inconvenience and confusion of reviewing separate dockets.  In addition, since the Debtors are seeking only administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be impacted.

25.     I believe that if each Debtor's case was administered independently, there would be a number of duplicative pleadings and overlapping service. This unnecessary duplication of identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Bankruptcy Court's resources.

26.     Further, the Debtors are requesting that their cases be substantively consolidated. As further set forth in the motion, substantive consolidation will likely benefit the Debtors by maximizing value and reducing administrative expenses.

27.     Therefore, I believe that the chapter 11 cases should be jointly administered and substantively consolidated.

**B.     Motion For Interim And Final Orders: (I) Authorizing the Incurrence of Post-Petition Financing; (IV) Scheduling Final Hearing; and (V) Granting Related Relief**

28.     The Debtors are seeking entry of orders pursuant to sections 105, 361, 362, and 364 of title 11 of the Bankruptcy Code; Bankruptcy Rules 2002, 4001, and 9014; and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Northern District of

Illinois (the "*Local Rules*"): authorizing interim and final use of cash collateral pursuant to the attached budgets (the "*Financing Motion*").

29. To minimize the uncertainty and adverse effects on their business associated with the commencement of a chapter 11 case, and in order to be able to pay the costs associated with the sale process the Debtors are proposing to undertake, the Debtors have filed the Financing Motion. Given the amount at issue, I do not believe that parties would be interested in making an unsecured loan, or even undertaking the diligence associated with such a loan.

30. The Debtors' estates will suffer immediate and irreparable harm if the Debtors do not obtain interim access to the DIP financing. As set forth in the consolidated Budget, over the first two weeks of the case, the Debtors project a cash shortfall of approximately $11,000.

31. In other words, the Debtors do not have sufficient revenues to operate their businesses, let along to pay the costs of the Chapter 11 cases, absent the DIP financing.

**C.     Motion for Entry of an Order (a) Approving Bid Procedures for the sale of Substantially all of the Debtors' Assets; (b) Scheduling an Auction and Sale Hearing; (c) Approving Assumption and Assignment Procedures; and (d) Approving Form and Manner of Sale Notice**

32. As referenced above, the Debtors are filing a motion (the "*Sale Motion*") seeking to accept the Stalking Horse Bid submitted by the Buyer, subject to higher and better bids, and have retained the CRO to conduct an independent sales and marketing process for the Debtors' assets.

33. The marketing process that the CRO plans to undertake is described in greater detail in the Sale Motion, and per the resolutions authorizing the bankruptcy filings (and attached to each petition), the CRO has been given full discretion over how to conduct the sale process. I understand that the CRO will welcome any suggestions from creditors who may have ideas for potential purchasers.

34. Based on my discussions with the CRO and my familiarity with the industry and the Debtors' assets, I believe that the sale procedures, including the Bid Protections (as defined in the Sale Motion), are reasonably designed to maximize the value of the Debtors' assets. I also believe that under the circumstances it is appropriate for the Debtors to accept the Buyer's bid as the Stalking Horse Bid.

D. **Application of the Debtors Pursuant to 11 U.S.C. §§ 327 and 328(a) for Authority to Employ and Retain Joshua Arlow of the Skutch Arlow Group as Chief Restructuring Officer Nunc Pro Tunc to November 7, 2016**

35. As repeatedly disclosed herein, the proposed Buyer is controlled by Betsy Hill, one of the Debtors' insiders. Although Ms. Hill, as the Debtors' Chief Operating Officer, is critical to the Debtors' day-to-day operations, the Debtors want to avoid even the appearance of a potential conflict of interest, or a concern among potential bidders that the insider nature of the Stalking Horse Bid could confer an unfair advantage upon Buyer.

36. I believe that the retention of Mr. Arlow as CRO is an appropriate and effective means of addressing these concerns, and maximizing the value of the Debtors' assets. As discussed above, Mr. Arlow will have complete discretion over the sales and marketing process, and will also have oversight over the Debtors' finances during the bankruptcy cases.

37. The Debtors submit that Skutch Arlow is a disinterested party and the Debtors propose to employ Skutch Arlow consistent with the provisions of section 327 of the Bankruptcy Code.

E.  **Application of the Debtors Pursuant to 11 U.S.C. §§ 327 and 328(a) for Authority to Employ and Retain Goldstein & McClintock LLLP as Counsel to the Debtors Nunc Pro Tunc to November 7, 2016**

38.  The Debtors are seeking to employ Goldstein & McClintock LLLP ("*G&M*") as their counsel to perform the legal services that will be necessary during the Chapter 11 Cases, effective as of the Petition Date, November 7, 2016.

39.  The Debtors submit that G&M is a disinterested party and the Debtors propose to employ G&M consistent with the provisions of section 327 of the Bankruptcy Code.

I declare under penalty of perjury that the foregoing is true and correct.

Date: November 14, 2016

By: _____
Roger Stark
Chief Executive Officer of LEC and BrainWare